# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DANNY DEAN FROGGE,       )
                                )
               Petitioner,    )
                                )
      v.                   )     1:05CV00502
                                )
MARVIN POLK, Warden     )
Central Prison, Raleigh,     )
North Carolina,           )
                                )
            Respondent.   )

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Danny Dean Frogge ("Petitioner"), a prisoner of the State of North Carolina, seeks relief pursuant to 28 U.S.C. § 2254. Petitioner was indicted on July 3, 1995, for the first degree murders of his father, Robert Edward Frogge, and stepmother, Audrey Yvonne Frogge. On September 8, 1995, Petitioner was convicted after trial by jury of both counts of first-degree murder; each count was based on premeditation and deliberation, and the felony murder rule. Following the capital sentencing proceeding held pursuant to N.C. GEN. STAT. § 15A-2000, the jury recommended the death penalty for the murder of Audrey Frogge and life imprisonment for the murder of Robert Frogge. On September 13, 1995, the Honorable William Z. Wood imposed the recommended sentences. The North Carolina Supreme Court ordered a new trial on March 7, 1997, based on

inadmissible, prejudicial evidence introduced at trial. *State v. Frogge*, 345 N.C. 614, 481 S.E.2d 278 (1997) ("*Frogge I*").

Petitioner was indicted on January 20, 1998, for the additional charge of robbery with a deadly weapon of his father on the night of the murders. On March 26, 1998, Petitioner was again found guilty after trial by jury of two counts of first degree murder on the bases of premeditation and deliberation and the felony murder rule; he was also found guilty of robbery with a deadly weapon. Petitioner was sentenced to life imprisonment for the murder of Robert Frogge[1] and to a concurrent term of 89 to 116 months imprisonment for the robbery charge. Following the second capital sentencing proceeding, the jury again recommended death for the murder of Audrey Frogge and the Honorable Peter M. McHugh imposed the recommended sentence on March 27, 1998. The North Carolina Supreme Court affirmed the conviction and sentence of Petitioner's second trial on May 5, 2000. *State v. Frogge*, 351 N.C. 576, 528 S.E.2d 893 (2000) ("*Frogge II*").

Petitioner filed a motion for appropriate relief ("MAR") and other ancillary motions in the Superior Court of Forsyth County on July 16, 2001. On June 19, 2002, the Honorable Lindsay R. Davis denied a portion of Petitioner's MAR and

---

[1] If a defendant is granted a new trial after a jury recommends a life sentence, the Due Process Clause of the Fifth Amendment bars the imposition of the death penalty during a subsequent trial. *Bullington v. Missouri*, 451 U.S. 430 (1981) (holding that the general rule that sentencing decisions are not barred by double jeopardy inapplicable in capital cases because of the heightened capital sentencing burden of proof requirements).

2

scheduled an evidentiary hearing on three ineffective assistance of counsel claims and a juror misconduct claim. Petitioner raised two additional claims in an amended MAR filed on July 13, 2002. On August 2, 2002, Judge Davis denied one claim and deferred ruling on a cruel and unusual punishment claim pending the evidentiary hearing.

The evidentiary hearing was held in the Superior Court of Forsyth County on August 12-14, 2002. On October 28, 2003, Judge Davis found ineffective assistance of trial counsel during the sentencing phase of the second trial and ordered a new sentencing hearing. The State filed a motion for reconsideration with the MAR court, which was denied on December 3, 2003. The State next file a petition for a writ of certiorari with the North Carolina Supreme Court on February 11, 2004, and review was granted on April 2, 2004. On February 4, 2005, the North Carolina Supreme Court reversed the MAR court's order finding ineffective assistance of counsel and reinstated Petitioner's death sentence. *State v. Frogge*, 359 N.C. 228, 607 S.E.2d 627 (2005) ("*Frogge III*").

Petitioner filed his petition for a writ of habeas corpus (docket no. 3) in this court on June 2, 2005. Petitioner has filed a brief in support of his petition, and the parties thereafter met their briefing schedules. The petition is ready for a ruling.

3

# I. FACTUAL BACKGROUND

The facts, as shown by the evidence at Petitioner's second trial and as set out by the North Carolina Supreme Court on direct appeal, are as follows:

The State's evidence at defendant's second trial tended to show that defendant stabbed his father and bedridden stepmother to death. At the time of the murders, defendant lived with his father and stepmother at their home in Winston-Salem. Defendant's father did not work, and his stepmother had been confined to her bed for over two years. Defendant worked part-time and helped around the house, but paid no rent.

Between 4:00 and 4:30 a.m. on 5 November 1994, the Winston-Salem Police Department received a 911 call from a person who identified himself as Danny Frogge. Frogge reported that his parents were dead. When Winston-Salem police officers arrived at the scene, they found the bodies of Robert and Audrey Frogge in their bedroom. Robert Frogge was found on the floor lying on his left side with bloodstains on his shirt and arms. He had sustained ten stab wounds. A leather wallet, containing his driver's license and miscellaneous papers but no money, was found next to his body. The wallet, which was lying open, had a drop and a smear of blood inside. Near the wallet, a white, bloodstained sock was found. An iron bar from a lawnmower was found under Robert Frogge's body. Audrey Frogge was found in her hospital-type bed with bloodstains on her chest and arms. She had sustained eleven stab wounds to her chest. In addition, she suffered defensive knife wounds to her hand. A hospital-type rolling table stood beside the bed. Dr. Patrick Lantz, a forensic pathologist, opined that the angle of the stab wounds indicated the person stabbing Audrey Frogge either stood at the edge of the bed beside the table or climbed on the bed itself to deliver the blows.

Outside the home near the back porch, the officers found a bloodstained butcher knife. Just beyond the edge of the woods behind the house, the officers found men's clothing, including a pair of blue work pants, a pink tee shirt with red stains, a pair of men's underwear, and a white sock which contained bloodstains and blood spatter. The white sock appeared to match the sock found near Robert Frogge's body. The officers also collected several pairs of white underwear and blue work pants from defendant's bedroom which appeared similar to those found in the woods.

While talking further with the officers that night, defendant appeared calm and showed no signs of emotion. In a statement to Winston-Salem Police Detective Sergeant Dennis Scales, defendant claimed that on the day of the murders he had been in and out of the house on numerous occasions taking care of his stepmother and preparing her supper. After a night of drinking and crack cocaine use with friends, he returned to the home at approximately 4:00 a.m. and found his parents murdered.

The State also offered into evidence defendant's testimony from the sentencing proceeding of his first trial. This testimony included the following: On the day of the murders, defendant worked around the house and later met with Earl Autrey, Audrey Frogge's son-in-law, at approximately 2:00 p.m. The two began drinking. Defendant went back to his parents' home to prepare supper for his stepmother and later returned to Autrey's home to continue drinking. Subsequently, defendant returned to his parents' home. Defendant had consumed almost an entire pint of liquor and several beers. Defendant's father awoke from a nap between 8:00 and 8:30 p.m. and began to argue with defendant about his drinking. Defendant could not recall what he said to his father; however, his father became so upset that he took an iron bar from a lawnmower and jabbed and hit defendant four or five times. Defendant got up, went to the kitchen, and retrieved a butcher knife. He recalled stabbing his father three or four times while his father held the iron bar. Defendant did not remember stabbing his stepmother, but admitted that he must have done it. He then took approximately twenty-five or twenty-six dollars from his father's wallet. Defendant attempted to wash the blood from his hands. He then changed clothes and threw the soiled clothes in the woods behind the house. When asked how blood got inside his father's wallet, defendant stated that he did not know, but admitted it might have dropped from his hand. Defendant left and went to Kim Dunlap's house. He and Dunlap then rode with Dunlap's sister to downtown Winston-Salem. They used the money defendant had taken from his father's wallet to purchase crack cocaine. After smoking the crack, defendant and Dunlap returned to defendant's parents' home in a taxicab around 4:00 or 4:30 a.m. Defendant entered the house, but returned to the taxicab and said that his parents were dead. He then called the police.

Defendant elected to testify on his own behalf at his second trial. His testimony was similar to that given at his first sentencing proceeding. He testified he served over four years in prison for a previous second-

degree murder conviction and that he saved $8,000 to purchase a mobile home where he resided for six months after his release. Thereafter he returned to live with his father and stepmother. Defendant again admitted killing his father and stepmother and stated that after the murders, he changed his clothes and washed his hands. His testimony differed somewhat in that defendant claimed he did not take the money from his father's wallet until after he had washed his hands and was preparing to leave the house approximately thirty minutes after the murders. Defendant again admitted purchasing crack cocaine with the money he took from his father's wallet.

*Frogge II*, 351 N.C. at 578-80, 528 S.E.2d at 895-96.

## II. CLAIMS FOR RELIEF

Petitioner has raised the following four claims for relief in his habeas petition:

1.  Trial counsel were ineffective and breached the objective standard of reasonableness in failing to develop and present mitigation evidence regarding Frogge's severe neurological injury.

2.  Frogge is entitled to a new sentencing hearing because the trial court erred in allowing the State to introduce his testimony from the first sentencing hearing during the second trial in violation of Frogge's Fifth Amendment privilege against self-incrimination.

3.  Frogge is entitled to a new sentencing hearing because the trial court erred in instructing the jury on the aggravating circumstance concerning the commission of the murders while the Defendant was engaged in the commission of robbery with a dangerous weapon on the grounds that the evidence was insufficient to support said aggravating circumstance.

4.  Frogge is entitled to a new sentencing hearing because the sentence of death is excessive or disproportionate to penalties imposed in similar cases.

(Docket No. 3, Habeas Pet. at 7-16).

## III. STANDARDS OF REVIEW

### A. Procedural Default

Federal courts are generally barred from reviewing habeas claims that were not reached on the merits in state court because of non-compliance with "independent and adequate" state procedural rules. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A state has an interest in its rules and procedures and in the finality of its judgments, which "would be undermined if the federal courts were free to ignore procedural forfeitures in state court." *Reed v. Ross*, 468 U.S. 1, 10 (1984). A state procedural rule is considered "'adequate' if it is regularly or consistently applied by the state court, and 'independent' if it does not depend[] on a federal constitutional ruling." *Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (citing *Johnson v. Mississippi*, 486 U.S. 578 (1988) and *Ake v. Oklahoma*, 470 U.S. 68 (1985)).

There are two exceptions to the procedural default bar. First, a habeas court may review an otherwise procedurally defaulted claim if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman*, 501 U.S. at 750; *see also McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000). To demonstrate "cause," a petitioner may make "a showing that the factual or legal basis for the claim was not reasonably available to counsel." *McCarver*, 221 F.3d at 591 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). To establish "prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and

7

substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 592 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Second, a habeas court may review an otherwise procedurally defaulted claim if the petitioner can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *see also McCarver*, 221 F.3d at 588. The "fundamental miscarriage of justice" exception applies only to a narrow class of cases involving "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey*, 499 U.S. at 494. Therefore, in order to establish a "fundamental miscarriage of justice," a petitioner must show actual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 346-47 (1992); *see also Smith v. Dixon*, 14 F.3d 956, 974 (4th Cir. 1994). To prove actual innocence, a death-penalty petitioner "must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." *Id.*

### B. Review on the Merits

Review of a state court decision on the merits of a prisoner's habeas corpus claims is limited by the deferential standard of review set forth in 28 U.S.C. § 2254(d), part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

8

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). After concluding that both the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) must be given independent meaning, the United States Supreme Court articulated the following standard of review:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring).

A state court's decision must be substantially different from relevant Supreme Court precedent before relief may be granted under the "contrary to" clause. *Id.* at 405 (noting that the word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed"). Under the "unreasonable application" clause, "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410. Therefore, "a federal habeas court may not issue the writ simply because

9

that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411; *see also Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000).

Section 2254 precludes *de novo* federal habeas corpus review of state court decisions on the merits of a petitioner's claim.  *Bell v. Jarvis*, 236 F.3d at 159-60 (overruling *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir. 1998)).  Even a summary adjudication, wherein the state court fails to articulate any rationale for its decision, is considered an adjudication on the merits and should be accorded deference under § 2254(d)(1).  *See id.* at 163.  When faced with a state court decision that does not explicitly cite or apply federal law, the habeas court should conduct an "independent examination of the record and the clearly established Supreme Court law."  *Id.* at 158.  Nevertheless, the habeas court must still confine its review to whether the "result" of the state court decision "is legally or factually unreasonable."  *Id.* at 163 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

Finally, the AEDPA did not substantially alter the standard of review concerning state court factual determinations.  Factual determinations made by a state court are afforded a presumption of correctness.  28 U.S.C. § 2254(e)(1).  In order to rebut the presumption of correctness, a petitioner must present clear and convincing evidence.  *Id.*

10

## IV. DISCUSSION OF CLAIMS

### A. Claim 1

Petitioner contends in Claim 1 that trial counsel provided constitutionally ineffective assistance by failing to develop and present mitigation evidence regarding his severe neurological injury that resulted from a 1990 head injury. Petitioner initially raised this claim in his MAR. The MAR court, following an evidentiary hearing, ruled that trial counsel were ineffective in failing to obtain a neurological evaluation of Petitioner prior to the second trial and ordered a new sentencing hearing. (Docket No. 7, Answer, Ex. R, MAR Order at 29). The North Carolina Supreme Court granted certiorari review, reversed the MAR court's finding of ineffective assistance, and reinstated Petitioner's death sentence. *Frogge III*, 359 N.C. at 245, 607 S.E.2d at 637-38.

"It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish an ineffective assistance of counsel claim, a "[petitioner] must show that counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional

11

norms." *Id.* at 688.  A claim that counsel's assistance was so defective as to require habeas relief from a conviction or death sentence has two components:

> First, the [petitioner] must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was not reliable.

*Id.* at 687.

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Id.* at 689.  Therefore, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range a reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* (internal quotation marks omitted).

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "Indeed, it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding,

because virtually every act or omission of counsel would meet this test." *Williams v. Taylor*, 529 U.S. at 394; *see also Strickland*, 466 U.S. at 693. "The petitioner bears the 'highly demanding' and 'heavy burden' in establishing actual prejudice." *Williams v. Taylor*, 529 U.S. at 394.

In the context of a capital sentencing proceeding, a demonstration of prejudice requires a showing that "there is a reasonable probability that, absent [trial counsel's objectively unreasonable performance], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. To make such a showing, a petitioner need not establish a reasonable probability that the entire jury would have voted against the imposition of the death sentence, rather that "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

During the sentencing phase of Petitioner's first trial, defense counsel presented lay testimony from people close to Petitioner concerning his 1990 head injury. Defense counsel also presented the expert testimony of clinical psychologist Gary Hoover, Ph.D., who conducted a forensic evaluation of Petitioner. Dr. Hoover based his evaluation on multiple interviews of Petitioner over a period of several months; interviews of Petitioner's family, friends, and acquaintances; and various records (including hospital records of Petitioner's head injury) and investigative reports. (Docket No. 7, Answer, Ex. A7, Trial Tr. 1 at 895-98). Based on the

13

forensic evaluation, Dr. Hoover diagnosed Petitioner with "[d]elirium due to multiple etiologies, substance intoxication delirium, alcohol and mood disorder due to postconcussive disorder." (*Id.* at 910-11). Dr. Hoover testified that Petitioner's 1990 head injury "left him with residual mood difficulties and cognitive functions" and "caused him to have episodic seizures, slurred speech and increased irritability, [a] more withdrawn type of personality, [and] episodes of paranoia over the years." (*Id.* at 911). Dr. Hoover concluded that Petitioner's head injury and resulting mood disorder coupled with his heavy consumption of alcohol on the day of the murders "were responsible for the explosion into rage that occurred when he was provoked by his father." (*Id.*).

The State presented the rebuttal expert testimony of neuropsychiatrist Steven Kramer, M.D. Dr. Kramer testified that Dr. Hoover's diagnoses were merely conclusory statements without any evidentiary support. (*Id.* at 997). Dr. Kramer characterized Petitioner's 1990 head injury as "mild to moderate" with a favorable prognosis of "full to near full recovery." (*Id.* at 1004-09). On redirect examination, Dr. Kramer reiterated the lack of data to support a finding of residual effects from Petitioner's head injury and testified that any causal relationship between his injury and the murders could be determined only through psychological testing. (*Id.* at 1043). Dr. Kramer testified that he would have expected such testing to have been administered in this case and that he was unaware of any justification for its omission. (*Id.*).

14

During the second trial, in addition to again introducing the lay testimony concerning Petitioner's head injury, defense counsel replaced Dr. Hoover with William Tyson, Ph.D., as the expert psychologist. Dr. Tyson interviewed Petitioner, administered various tests, and reviewed all relevant medical and case records. (Docket No. 7, Answer, Ex. B5, Trial Tr. 2 at 198-99). Dr. Tyson concluded that Petitioner "suffered from a personality disorder . . . defined as a pervasive limitation to adult functioning that had been aggravated by long term substance abuse and dependence." (*Id.*). Because of this disorder, Dr. Tyson believed that "it was most likely [Petitioner] would have been acting on impulse with limited ability to reason" during the 1994 murders. (*Id.* at 199). The State again presented the rebuttal expert testimony of Dr. Kramer, who testified that there was insufficient evidence to support either a psychiatric diagnosis of a personality disorder or a finding that Petitioner was unable to form the specific intent to kill. (*Id.* at 316-17).

Petitioner was appointed new counsel for post-conviction review and filed an MAR alleging ineffective assistance of trial counsel for failure to investigate and present mitigation evidence concerning the residual neurological effects of his 1990 head injury. The MAR court conducted an evidentiary hearing and Petitioner introduced the expert testimony of psychologist Claudia Coleman, Ph.D., and neurologist Thomas Hyde, M.D., Ph.D. Dr. Coleman diagnosed Petitioner with cognitive disorder not otherwise specified, personality disorder with paranoid and aggressive features, and "polysubstance dependence," which she believed to be

15

causally related to Petitioner's 1990 head injury. (Docket No. 7, Answer, Ex. C1, MAR Tr. at 42-55). Dr. Hyde testified that Petitioner had organic or structural brain damage resulting from his 1990 head injury. (*Id.* at 220). Both experts agreed and testified that, at the time of the 1994 murders, Petitioner suffered from a diminished mental capacity such that he could not fully weigh and understand the consequences of his actions and that he was under the influence of an emotional or mental disturbance. (*Id.* at 66-67, 241-42).

Petitioner's trial counsel also testified at the MAR hearing. Because of their dissatisfaction with Dr. Hoover's performance during the first trial, they retained Dr. Tyson as an expert psychologist for the second trial. (Docket No. 7, Answer, Ex. C2, MAR Tr. at 567-68). Trial counsel provided Dr. Tyson with information concerning Petitioner's 1990 head injury and relied on his diagnosis and opinion that further experts and testing were unnecessary. (*Id.* at 440, 467, 567). The MAR court concluded that such reliance, in light of Dr. Kramer's testimony during the first trial, constituted constitutionally ineffective assistance of counsel and ordered a new sentencing hearing. (Docket No. 7, Answer, Ex. Q, MAR Order at 16-29).

In its detailed review of the MAR court's decision, the North Carolina Supreme Court outlined the following pertinent factors that trial counsel faced when formulating their strategy for Petitioner's second trial:

> First, defendant had committed a murder prior to suffering the head injury. Second, graphic lay evidence of defendant's 1990 head injury and its sequelae had been presented through his sisters and others

close to him at the [first] trial and would be presented again. Third, at the [first] sentencing proceeding, Dr. Hoover had presented an expert psychological opinion that took into account both defendant's head injury and his background. The sentencing jury, having heard that evidence, returned a capital verdict. Fourth, Dr. Kramer criticized Dr. Hoover for failing to conduct additional psychological testing that might determine whether defendant's head injury was a contributing factor to the murders. However, Dr. Kramer went on to state that, in his opinion, the 1990 injury was of mild to moderate severity and defendant's prognosis on discharge was good, implying that the additional psychological testing was unlikely to bear fruit. Dr. Kramer did not indicate that in preparation for trial defendant should have been tested for organic brain damage or neurological harm resulting from the 1990 head injury. Fifth, defense counsel were dissatisfied with Dr. Hoover's performance in [the first trial] and replaced him with Dr. Tyson, who had been an effective witness in the past for attorney Freedman. When supplied with defendant's medical and social histories and with transcripts of the proceedings in [the first trial], Dr. Tyson stood by his opinion that defendant suffered from a personality disorder and, at the time of the murders, was acting on impulse with limited ability to reason.

*Frogge III*, 359 N.C. at 240-41; 607 S.E.2d at 634-35. The court discussed the breadth of evidence obtained and considered by trial counsel and determined that they "cannot be said to have 'acquired only rudimentary knowledge of [defendant's] history from a narrow set of sources.'" *Id.* at 242, 607 S.E.2d at 635 (quoting *Wiggins*, 539 U.S. at 524). The court specifically addressed trial counsel's decision not to pursue neurological testing for Petitioner as follows:

By the time defense counsel were preparing for defendant's second trial, they had consulted two mental health experts, Drs. Hoover and Tyson, both of whom had full access to defendant, his family, and the pertinent medical records of defendant's head injury, and neither of whom recommended neurological testing.

17

> In addition, defense counsel testified that they depended on Dr. Tyson to advise them whether or not additional testing of defendant was needed but that, after receiving all the information from the first trial, Dr. Tyson stuck by his original diagnosis of defendant. This testimony indicates that defense counsel were prepared to seek such testing if they had adequate reason to believe it was necessary or would be useful.

*Id.* at 241-42, 607 S.E.2d at 635. Based on the foregoing, the North Carolina Supreme Court concluded that trial counsel "did not prematurely abandon a defense based on organic brain damage and that their election to pursue a defense predicated on other grounds constituted a 'reasonable professional judgment[].'" *Id.* at 245, 607 S.E.2d at 637 (quoting *Wiggins*, 539 U.S. at 533 and *Strickland*, 466 U.S. at 691). Therefore, the MAR court's decision was reversed and Petitioner's death sentence was reinstated.

Petitioner contends that trial counsel's reliance on the opinions of Drs. Hoover and Tyson not to seek neurological testing was objectively unreasonable in light of the "roadmap" testimony of Dr. Kramer in the first trial. As noted, Dr. Kramer testified during the first trial that psychological testing was necessary to determine whether Petitioner's head injury was a contributing factor in the 1994 murders and that he saw no justification for its omission in this case. Based on *Wiggins* and the recent case of *Rompilla v. Beard*, 125 S. Ct. 2456 (2005), Petitioner argues that trail counsel conducted an inadequate investigation into potential mitigating evidence and that their failure to secure neurological testing in anticipation of a repeat attack on the credibility of their mental health expert during the second trial was unreasonable.

18

Nevertheless, this case is distinguishable from both *Wiggins* and *Rompilla*. In *Wiggins*, trial counsel made a tactical decision not to present mitigating evidence during the sentencing phase of trial, and the United States Supreme Court determined that the investigation underlying that decision amounted to ineffective assistance of counsel. 539 U.S. at 535. In contrast, trial counsel in this case conducted a thorough investigation that included multiple meetings with Petitioner; interviews with Petitioner's family and friends; review of school, hospital, and correctional system records, and investigative reports; and consultation with two mental health experts. In *Rompilla*, trial counsel were found to be ineffective despite an investigation that included the defendant, his family, and three mental health professionals because they neglected to review a prior conviction case file that was likely to be used by the prosecution as aggravation evidence that also contained significant evidence of mitigation. 125 S. Ct. at 2464. In contrast, trial counsel in this case considered all relevant mitigating evidence; their informed decision not to pursue neurological testing cannot be equated with the complete lack of consideration of the case file as in *Rompilla*. Furthermore, Dr. Kramer's "roadmap" testimony, the underlying factual basis for this claim, is tempered by his further testimony that Petitioner's head injury was "mild to moderate" and the informed, contrary expert opinions of two mental health professionals.

A review of the record supports the ruling of the North Carolina Supreme Court; trial counsel's decision not to pursue evidence of organic brain damage

19

through neurological testing was not contrary to or an unreasonable application of *Strickland* or its progeny. There is no requirement to "shop around" for a more favorable expert opinion and the hindsight of a later obtained diagnosis does not render representation ineffective. *See Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) (holding that "[t]he mere fact that his counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance"); *see also Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998) (finding that a challenge to "counsel's decision not to investigate mental health issues more fully is 'a product of hindsight and fails to address the facts reasonably relied upon by counsel at the time'") (quoting *Roach v. Martin,* 757 F.2d 1463, 1478 (4th Cir.1985)). Even assuming *arguendo* that this court in its independent judgment believed that trial counsel were in error for failing to pursue neurological testing, the deferential standard of review under the AEDPA precludes relief. As noted, the North Carolina Supreme Court's decision is neither unreasonable nor substantially different from relevant United States Supreme Court precedent. Claim 1 should, therefore, be denied.

### B. Claims 2-4

Claims 2-4 are presented and discussed only in Petitioner's habeas petition. Each claim is followed by a redundant, one-sentence statement of purported "supporting facts" that simply paraphrases the claim itself. (*See* Docket No. 3,

20

Habeas Pet. at 15-16). Petitioner articulates no argument whatsoever in any of the pleadings filed in this case as to how the state court's decisions were contrary to or an unreasonable application of established federal law.[2] Accordingly, Claims 2-4 may be both considered waived for purposes of habeas review, *see McCarver v. Lee*, 221 F.3d 583, 588 n.1 (4th Cir. 2000) (declining to consider issues on habeas review in a capital case that were not briefed before the court) and dismissed as unsupported, conclusory claims, *see Nickerson v. Lee*, 971 F.2d 1125 (4th Cir. 1992). Despite Petitioner's clear abandonment of Claims 2-4, each claim will nonetheless be discussed further to foreclose any future argument of insufficient consideration by this court.

      1. <u>Claim 2</u>

Petitioner contends in Claim 2 that his Fifth Amendment privilege against self-incrimination was violated by the improper introduction of his testimony from the sentencing phase of his first trial during his second trial. This claim was found to be waived by the North Carolina Supreme Court on direct appeal. By testifying at the guilt phase of the second trial after testimony from the sentencing phase of the first

---

   [2] In an order dated May 27, 2005, the court informed the parties that all briefs in this case "shall be self-contained, autonomous units containing all . . . legal arguments" and required that each issue be separately briefed. (Docket No. 4, Scheduling Order at 3). In addition, the standard briefing limitations under Local Rule 7.3(d) were expanded to sixty pages for initial and response briefs and to twenty pages for reply briefs. (*Id.*). The complete omission of Claims 2-4 from Petitioner's briefs was not the result of constrained briefing limitations; he utilized only eighteen pages for his initial brief (docket no. 8) and only three pages for his reply brief (docket no. 10).

trial was admitted into evidence over his objection, Petitioner "lost the benefit of his previous objection and waived review of this issue." *Frogge II*, 351 N.C. at 582, 528 S.E.2d at 898 (citing *State v. Hunt*, 339 N.C. 622, 638, 457 S.E.2d 276, 285 (1994)).

On habeas review, federal courts are precluded from reviewing claims that were defaulted in state court for non-compliance with "independent and adequate" state procedural rules. *Coleman*, 501 U.S. at 750; *see also Wainwright v. Sykes*, 433 U.S. 72 (1977). The North Carolina procedural rule at issue in this case has been regularly or consistently applied by the state court and does not depend on a federal constitutional ruling.

> It is well settled that "[w]here evidence is admitted over objection, and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost." *State v. Whitley*, 311 N.C. 656, 661, 319 S.E.2d 584, 588 (1984). As stated in [*State v.*] *Hunt,* [339 N.C. 622, 457 S.E.2d 276 (N.C. 1994)], "'[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives.'" *Hunt,* 339 N.C. at 638, 457 S.E.2d at 285 (quoting *Harrison* [*v. United States*]*,* 392 U.S. [219,] 222, 88 S. Ct. [2008,] 2010, 20 L. Ed.2d [1047,] 1051 [1968]); *accord State v. Terry,* 337 N.C. 615, 624, 447 S.E.2d 720, 725 (1994) (where this Court held "defendant waived his objection to [the admission of his statement to police] when he testified on direct examination that he had made this statement, that the statement was not true, and that he made it because he was afraid of going to jail").

*Frogge II*, 351 N.C. at 583, 528 S.E.2d at 898. As a result of failing to brief this issue, Petitioner has neither established cause for excusing the procedural default and prejudice resulting therefrom, nor that failure to consider this claim would result in a fundamental miscarriage of justice. This claim is, therefore, barred from federal review by reason of Petitioner's procedural default.

2. <u>Claim 3</u>

In Claim 3, Petitioner contends that there was insufficient evidence to support the aggravating circumstance that he committed the murders during the commission of a robbery with a dangerous weapon. The North Carolina Supreme Court considered and denied this claim on direct appeal, finding the evidence sufficient to support the robbery with a dangerous weapon conviction and the subsequent submission of the robbery to the jury as an aggravating circumstance. *Frogge II*, 351 N.C. at 584-86, 528 S.E.2d at 898-900.

The determination of whether there is constitutionally sufficient evidence to prove the existence of an aggravating circumstance is governed by the standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979). "Under the *Jackson* standard, a court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements . . . beyond a reasonable doubt.'" *Roach v. Angelone*, 176 F.3d 210, 218 (4th Cir. 1999) (quoting *Jackson*, 443 U.S. at 319). As found by the North Carolina Supreme Court, and presumed correct on federal habeas review under 28 U.S.C. § 2254(e)(1), the evidence presented by the State at trial:

> tended to show the wallet was found lying open in front of the victim's body. The wallet contained a driver's license and other papers, but no money. Inside the wallet were a drop and a smear of blood. During defendant's testimony at the sentencing phase of his first trial, he admitted that the blood inside the wallet could have come from his hand. While testifying at the second trial, defendant admitted he removed about twenty-five or twenty-six dollars from the wallet and he changed his clothes and cleaned up before leaving. However, on

23

cross-examination at the second trial, defendant could not explain the presence of blood inside the wallet if he did not take the money until after cleaning up and disposing of the murder weapon and bloody clothes. This evidence supports a reasonable inference that the blood was dropped in the wallet when defendant removed the money from the wallet immediately after the murder.

*Frogge II*, 351 N.C. at 585, 528 S.E.2d at 899. Considering the compelling nature of this evidence, it is clear that a rational trier of fact could have concluded that Petitioner committed the murders during the commission of a robbery. The state court's decision denying this claim is neither contrary to, nor an unreasonable application of, established Supreme Court precedent.

### 3. Claim 4

Finally, Petitioner contends in Claim 4 that his death sentence is excessive or disproportionate to the penalties imposed in similar cases. The North Carolina Supreme Court is statutorily required to review all capital cases and consider, among other things, whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C. GEN. STAT. § 15A-2000(d)(2). On direct appeal, the North Carolina Supreme Court compared Petitioner's case with the seven North Carolina death sentences that have been overturned as disproportionate and found that it was "not substantially similar" to any of them. *Frogge II*, 351 N.C. at 587-88, 528 S.E.2d at 900-01. The court also compared Petitioner's case with previous capital cases that have been affirmed as proportionate and found it to be "more similar to cases in

24

which we have found the sentence proportionate than to those in which we have found it disproportionate." *Id.* at 589, 528 S.E.2d at 901.

Proportionality review, however, is not constitutionally mandated. *See Pulley v. Harris*, 465 U.S. 37, 44 (1984) (The federal Constitution does not require a "state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases even if requested to do so by the prisoner."); *see also Buchanan v. Angelone*, 103 F.3d 344, 351 (4th Cir. 1996) (the federal Constitution does not require proportionality review of capital cases). Claim 4 is, therefore, not cognizable on habeas review and should be denied.

## V.  CONCLUSION

**IT IS THEREFORE RECOMMENDED** that the petition for habeas corpus (docket no. 3) be denied and that judgment be entered dismissing all of Petitioner's claims.


_____
Wallace W. Dixon
United States Magistrate Judge

March 28, 2006